**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| THOMAS PENNIE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 07 C 1596 |
| | ) | |
| UNITED PARCEL SERVICE, INC., | ) | Judge Rebecca R. Pallmeyer |
| an Ohio corporation, | ) | |
| | ) | |
| Defendant. | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

On May 15, 2003, Thomas Pennie ("Pennie) and his former employer United Parcel Service,

Inc. ("UPS"), entered into an agreement settling four workers' compensation cases involving injuries

sustained during Pennie's employment with UPS. UPS asserts that it understood one of these

claims to involve a "permanent 25-pound lifting restriction" that would prevent Pennie from returning

to his regular job as a package car driver and that, as part of the settlement agreement, Pennie

agreed to be "separated" from his employment at UPS. Pennie, on the other hand, claims he

understood the settlement agreement to compensate him only for non-permanent injuries and lost

wages and that his resignation was not part of its terms.

Twelve days after signing the settlement agreement, Pennie attempted to return to regular

job as a package car driver. UPS refused to allow him to resume work. Pennie filed this suit four

years later, alleging that UPS discharged him in violation of the Americans with Disabilities Act

("ADA") (Counts I and II); in violation of Title VII, by refusing to reinstate him because he is a white

male (Counts III, IV, and VIII); in violation of 42 U.S.C. § 1981, by discriminating against him as a

member of a protected class (Counts V and VI); and in violation of the ADA and at common law,

by discharging him for filing a charge of discrimination (Counts VII and IX). UPS filed a

counterclaim against Pennie, charging that Pennie's receipt of benefits for disability constituted

fraud. Both parties have moved for summary judgment. For the reasons discussed below, the

court grants UPS's motion for summary judgment on all counts in Pennie's complaint and denies

Pennie's motions for summary judgment on Counts I and II. Pennie's motion for summary judgment on UPS's counterclaim is also denied.

## BACKGROUND

Pennie began working for UPS in 1987 as a customer service clerk. (Pl.'s 56.1 ¶ 5.) In September 1995, he applied for and obtained a position as a package car driver and began working as a driver at UPS's Beachview Center in Chicago. He later worked at UPS's River North Center and finally at its Lakeview Center, where he reported to Steve Lopez and Bob Baysinger. (Pl.'s 56.1 ¶ 5.) At all these centers, Pennie worked as a "swing" driver, a full-time position in which he filled in for other drivers temporarily unable to work their routes. Throughout his employment as a driver, Pennie was also a member of International Brotherhood of Teamsters, Local 705, and his employment was governed by the union's collective bargaining agreement with UPS. (Pl.'s 56.1 ¶ 5.)

The job of a package car driver is often physically demanding. On average, packages shipped by UPS weigh around 12 pounds, but UPS accepts packages weighing up to 150 pounds for delivery on package cars. (Def.'s Am. 56.1 ¶ 11-12.) On any given day, each package car could receive between 5 and 25 packages weighing from 60 to 70 pounds and between 5 and 10 packages weighing more than 70 pounds. (Def.'s Am. 56.1 ¶ 11.) Among the "essential job functions" of a package car driver, as defined by UPS, are the abilities to "lift, lower, push, pull leverage and manipulate packages . . . occasionally" weighing up to 70 pounds and to assist in moving packages between 70 and 150 pounds. (Def.'s Am. 56.1 ¶ 12-13.)

### Pennie's Work-Related Injuries

Although the chief point of contention between the parties is the impact of Pennie's back injuries, the May 15, 2003 Settlement Agreement between the parties compensated Pennie for a total of four injuries, briefly summarized here. In 2001, Pennie filed four workers' compensation claims for four separate injuries to his hand, eye, and back sustained in the course of his

employment between November 1999 and August 2001: on April 27, 2001 and November 14, 2001, Pennie filed claims for injuries involving back strain; on November 14, 2001, he filed a claim for a cut to his left hand; and on December 3, 2001, he filed a claim for a lacerated cornea. (Pl.'s 56.1 ¶ 20.)

The first injury occurred on November 19, 1999, when Pennie cut his left hand on a metal band around a package. He received seven or eight stitches and missed approximately six days of work. On December 1, 1999, Dr. Jane Cullen notified a clerical specialist at UPS's Health and Safety Center that she had placed Pennie under "lifting and other work restrictions" until his hand was fully healed. (Pl.'s 56.1 ¶ 8.) Sometime later (Pennie does not indicate the exact date), Pennie returned to job as a swing car driver. He filed a workers' compensation claim for his hand injury in November 2001.

On August 1, 2000, an envelope fell from a shelf and cut Pennie's eye, resulting in a "lacerated cornea" that became the basis for a December 3, 2001 his workers' compensation claim. Pennie does not indicate whether he received treatment or missed work because of this injury.

On March 2, 2001, Pennie strained his back. Ralph Kester, a chiropractor, and Dr. Scott Morris,[1] a physician at Concentra Medical Center (UPS's designated medical facility), treated Pennie for this injury. (Pl.'s 56.1 ¶ 11; "UPS 0021-0026," App. A to Pl.'s 56.1.) Although initially unable to return to work, Pennie met with his supervisor, Robert Baysinger, on March 5, 2001. (Pl.'s 56.1 ¶ 10.) On March 6, 2001, Baysinger placed a note in Pennie's employee file at UPS, which reads in part:

> RE: Tom Pennie's alleged injury . . .
> On Monday 3/5/01 at approximately 7 am Tom came into the DIAD room and said he had to see a chiropractor . . . I said Tom you might want to look into another profession because you seem to get hurt a lot and your (sic) unable to work. He said he hasn't been hurt and that he's always here . .

---

[1]     Neither Dr. Morris's area of speciality, nor that of many other doctors who treated Pennie, appears in the record.

(Pl.'s 56.1 ¶ 12.)  Baysinger sent a copy of the note to "Safety," apparent shorthand for UPS's "Health and Safety Group."  (Pl.'s 56.1 ¶ 12; Def.'s 56.1 Resp. ¶ 12.) Sometime shortly after the accident, Baysinger again told Pennie that he "might want to think about another profession because we need our drivers five days a week."  (Baysinger Dep. at 23-24, Ex. C to Def.'s Mem.; Pl.'s 56.1 ¶¶ 10-12; Def.'s 56.1 Resp. ¶ 10.)   On March 13, 2001, Pennie returned to work with a temporary 25-pound lifting restriction, and UPS assigned him "temporary alternative work" ("TAW") for the period from March 13, 2001 through March 27, 2001.   TAW, or "light duty," generally consists of assignments that are less physically demanding.   Pennie's TAW assignment consisted of running a "shuttle route," which involves delivering packages between UPS facilities with the help of other employees, and working in the office at the Lakeview Center.   (Def.'s Am 56.1 ¶ 19.) Pennie resumed his regular duties package car driver on March 28, 2001.  He filed his claim for this injury on April 27, 2001.

On August 23, 2001, Pennie strained his back again, while depressing the clutch on his package car.  (Pennie Dep. at 71, 75.)  Dr. Ellen Fertelmeister at Concentra Medical Center examined Pennie and diagnosed his condition as "lumbar strain."   Pennie had a follow-up examination with Dr. Leigh Rosenblum, who also diagnosed him as suffering from "lumbar strain." Following this injury, Pennie took approximately four days off work.  (Pl.'s 56.1 ¶ 13.)  When he returned, UPS again placed him on TAW.  Initially, he worked two days, September 6 and 7, as a package delivery driver in his regular position working the "swing" route.   According to his deposition testimony, the route was high-volume, and Pennie complained to two drivers on the safety committee that the swing route was "very difficult and that [he] had a strain as a result." (Pennie Dep. at 88-89, Ex. A to Def.'s Mem.)  UPS then placed him on a "shuttle route," delivering lighter packages between UPS facilities where there are other UPS employees on hand to handle large or heavy packages.  (Def.'s

Am. 56.1 ¶ 19.)

On August 23, 2001, Baysinger inserted another note in Pennie's employee file in which he reported that Pennie

> claims to have hurt himself depressing his clutch after he unhooked his chain on his back door at 2450 Main. He said he felt a twinge in his lower back as he was depressing his clutch. I asked if he felt anything before this he said no. He did say his [sic] this particular clutch hi [sic] alittle [sic] harder than most. And then went on to explain the different clutches in other package cars. I talked to the treating physician Ellen X. Fertelmesiter [sic] is [sic] this was possible to strain his back by depressing his clutch. She did say he had a lumbar strain and reviewed his restrictions. I then talked with Janet the physical therapist and asked her this was an unusual injury caused by a clutch and she said no that anything is possible. I said he wasn't bending or lifting things that I thought caused back injuries. I also said that Tom said this was the first he felt discomfort and it just seem [sic] to her that he felt some discomfort on Monday when he had a high step vehicle.
>
> It seems alittle [sic] particular [sic] that he would mention this to her and not me when I asked him questions about the injury.

(Pl.'s 56.1 ¶ 14.)  Pennie testified that in March and August of 2001, Baysinger commented that Pennie had "a bad back." Baysinger denies ever making such a statement.  (Pl.'s 56.1 ¶¶ 10, 13.)

**Pennie's Work and Medical History Through January 2002**

On September 13, 2001, Dr. Ralph Kester, Pennie's personal physician, examined Pennie, and imposed certain work restrictions, including "no repetitive lifting over 40 pounds," "no pushing or pulling over 50 pounds," and "no bending greater than 10 times per hour."  (Pl.'s 56.1 ¶ 16.)  Dr. Kester's report noted that "no permanent disability is expected."  (*Id.*)  Dr. Kester examined Pennie again on September 17, 2001, and continued his previous work restrictions, noting then that Pennie's progress was "good" and that he anticipated Pennie's eventual return to his regular job. (Pl.'s 56.1 ¶ 17.)  On September 27, 2001, Dr. Jessie Butler, a doctor at the Center for Orthopedic Surgery, examined Pennie, recommended continued work restrictions in accordance with Dr. Kester's report, and anticipated Pennie's return to regular work.  (Pl.'s 56.1 ¶ 18.)

On October 1, 2001, Pennie took vacation time and then immediately began an eight-week leave under the Family and Medical Leave Act for the birth of his second child.  (Pl.'s 56.1 ¶ 19.)  On October 30, 2001, he filed an application for benefits with the Illinois Industrial Commission,

seeking recovery for the four injuries he had sustained during his employment from November 1999 through August 2001.  (Pl.'s 56.1 ¶ 20.)

Pennie returned to Dr. Butler for a follow-up examination on November 21, 2001.  After examining Pennie, Dr. Butler issued a report to Charles Zhungo, a claims adjuster at Liberty Mutual, the third-party insurance carrier that administers and defends workers' compensation claims on behalf of UPS.  (Def.'s Am. 56.1 ¶ 34.)  Dr. Butler recommended a 30-pound lifting restriction for the first two weeks after Pennie's return to work, followed by an increased lifting limit of 60 pounds, and an eventual return to work without any restrictions.  (Def.'s Am. 56.1 ¶ 23.)  Pennie returned to work on December 10, 2001 under the lifting restrictions recommended by Dr. Butler.  (Pl.'s 56.1 ¶ 19.)  Due to his 30-pound lifting limit, UPS again assigned Pennie to TAW work, running shuttle routes and assisting other drivers on their routes.  (Def.'s Am. 56.1 ¶ 24.)  Pennie saw Dr. Butler a fourth time on December 21, 2001.  At that point, Dr. Butler decided to leave the original 30-pound restriction in place and advised Pennie to avoid work requiring anything more than occasional bending, lifting or twisting.  (Pl.'s 56.1 ¶ 25.)  Dr. Butler's report also noted that Pennie "feels his previous work restrictions are not being complied with [by UPS]."  (Ex. 12 to Pennie Dep.)

On December 5, 2001, Zhungo scheduled an independent medical examination of Pennie by Dr. Klaud Miller.  (Pl.'s 56.1 ¶ 22.)  Dr. Miller examined Pennie on December 17 and sent his evaluation to Zhungo on December 28.  (Pl.'s 56.1 ¶ 24.)  In his report, Dr. Miller responded to a series of questions posed by Liberty Mutual about Pennie's current condition and prognosis.  He diagnosed Pennie as suffering from "degenerative disc disease," a condition that "tends to progress with time" and may involve recurrent, incapacitating episodes, but nonetheless pronounced Pennie's short-term prognosis as "good."  (*Id.*)  He did not believe Pennie "had reached maximum medical improvement" at the time of the exam and recommended "an aggressive exercise program" to return him to full capacity, with light duty work in the interim.  Dr. Miller estimated that Pennie could return to work without restrictions in approximately four weeks, but noted, "he will more likely

than not have future episodes, although the exact frequency and duration cannot be determined with any degree of accuracy."

Liberty Mutual produced an unmarked copy of Dr. Miller's report in discovery. UPS also produced a copy of the report that had been extensively underlined by hand. (Pl.'s 56.1 ¶ 24; UPS 421-28, App. A to Pl.'s 56.1.) UPS's copy begins on page 2 and appears to be a fax, though the cover sheet is missing and the sender and receiver are not identified. (Pl.'s 56.1 ¶ 24.) UPS contends that the markings cannot be attributed to UPS as Pennie did not authenticate the document as required by Fed. R. Civ. P. 56.(e), and it is not clear from the record who made the markings. (Def.'s 56.1 Resp. ¶ 24.) Dennis Mergen, the Safety and Health Group manager who told Pennie in May 2003 he could not return to work after signing the Settlement Agreement, testified that he could not recall ever seeing the report, but admitted that his office would have received a copy. (Mergen Dep. at 55, 59-60, Ex. B to Pl.'s Mem.) He further testified that he did not have extensive involvement in workers' compensation claims at the time and that it was Laurie Saindon, a district occupational health supervisor who worked under Mergen at UPS, who "basically managed the workers' comp cases." (Mergen Dep. at 12.) According to Mergen's testimony, Saindon "would keep track of [employees who had filed workers' compensation claims] to make sure that the employee was . . . seeking the medical attention they needed, they were keeping their appointments, monitoring the progress of the case." (Mergen Dep. at 13.) Saindon was not deposed by either party.

On January 4, 2002, Laurie Saindon sent a fax to Dr. Butler regarding the medical reports from Pennie's November 21 and December 21 examinations. The fax asks Dr. Butler to review the documents because "some statements appear to be fraudulent." Saindon observed that "it appears that the employee made various changes" on the November 21 report in order to generate an additional report dated December 21. (Pl.'s 56.1 ¶ 26.) The fax does not specifically identify the suspected fraudulent statements, and the injury reports are not included in the record. On

January 7, 2002, an employee at the Illinois Bone and Joint Institute sent Saindon's assistant a fax confirming that Pennie had not altered the reports. (Pl.'s 56.1 ¶ 26.)

**Pennie's Seventeen-Month Leave of Absence**

On or around January 18, 2002, Saindon contacted Pennie and, according to Pennie's deposition testimony, told him that he could not return to work as a package car driver until he had been cleared for full duty. (Pl.'s 56.1 ¶ 27.) According to UPS, Pennie was ineligible to return to work because the collective bargaining agreement between Local 705 and UPS provides for only 30 days of TAW, and Pennie had used his full 30 days. (Def.'s 56.1 ¶¶ 20, 26.) In fact, the collective bargaining agreement does not state any limit for TAW, and Pennie disputes that such a limit exits. (Collective Bargaining Agreement, Ex. 1 to Pennie Dep, Art. 14, § 2; Pl.'s 56.1 Resp. ¶ 20.) UPS admits that an operations manager can request an extension beyond the purported 30-day limit for an employee who is near full recovery from any restrictions. Baysinger, Pennie's operations manager, did not request such an extension for Pennie. (Def.'s 56.1 Resp. ¶ 63.)

In late January, UPS placed Pennie on workers' compensation leave of absence, and Pennie began collecting benefit payments for temporary total disability. (Def.'s 56.1 ¶ 26.) From February 13, 2002 through May 15, 2003, Pennie received temporary total disability benefit payments of approximately $652.87 per week. (Def.'s Am. 56.1 ¶ 38.) During this period, Baysinger called Pennie every few weeks to check on his condition. (Pl.'s 56.1 ¶ 60.) Baysinger testified that their conversations were typically brief and substantively the same: Baysinger would ask how Pennie was doing or when he expected to return, and Pennie would respond, "You tell me. I don't know. It's your doctor." (*Id.*)

On January 30, 2002, UPS directed Pennie to see Dr. Leslie Alpert of Evanston Northwestern Medical Health Care for a "functional capacity evaluation" to determine his lifting capacity. (Pl.'s 56.1 ¶ 27.) The first series of exercises required Pennie to lift incremental weights from the floor to "knuckle height," at approximately the mid-thigh. Pennie was able to lift 105

pounds to knuckle height, but only with difficulty. (Pennie Dep. at 133, Ex. A to Pl.'s mem.) Dr. Alpert then requested Pennie perform a series of lifts from knuckle to shoulder height and from shoulder height to over the head. Ultimately, Pennie was able to lift only 25 pounds from mid-thigh to shoulder height and no more than 25 pounds from shoulder height to over his head. (Def.'s Am. 56.1 ¶ 27; Pennie Dep at 130-33.)

On February 13, 2002, Dr. Butler reviewed the functional capacity evaluation results with Pennie. (Pl.'s 56.1 ¶ 29.) Based on those results, Dr. Butler set a 25-pound lifting restriction and discharged Pennie from his care with directions that Pennie follow-up on an "as needed basis." (Pl.'s 56.1 ¶ 28; Def.'s Am. 56.1 ¶ 28.) The report does not indicate whether the restriction was permanent. (Ex. 15 to Pennie Dep.) According to his deposition testimony, Pennie told Dr. Butler that he thought the functional capacity evaluation "was a reflection of [his] ability at that moment in time," but the results were tainted due to what he perceived as the unnecessary test of lifting 105 pounds to knuckle height. (Pl.'s 56.1 ¶ 29; Pennie Dep. at 146-47.) Pennie also testified that he anticipated future physical therapy as part of a "work hardening" program suggested in the functional evaluation report; but the report itself does not mention future therapy or "work hardening," nor has either party defined this expression. (Pennie Dep. at 146-47, 163; Ex. 14 to Pennie Dep.) After his examination, Pennie gave a copy of Dr. Butler's 25-pound lifting restriction to his supervisor, Steve Lopez. (Def.'s 56.1 ¶ 32) Pennie testified that he believed he was capable of returning to work as a package car driver at this time, but did not say anything to Lopez about this belief, nor express any disagreement with the lifting restriction. (Pennie Dep. at 161-62, 183.)

On March 4, 2002, Dr. Miller examined Pennie to determine the reasonableness of the 25-pound lifting restriction and issued a second report to Liberty Mutual. (Pl.'s 56.1 ¶ 30.) In this second report, Dr. Miller agreed that the 25-pound restriction was reasonable and that Pennie could perform work that did not exceed the restriction. (*Id.*) Dr. Miller's report did recommend "work hardening" and opined that "a good exercise program as outlined in my original report would help

[Pennie] improve his capabilities."   According to the report, Pennie made the following representations to Dr. Miller:

> At the current time, he stated that he really had no true pain. He describes the sensations as more of an ache. They were primarily in the left lumbar and left gluteal areas. They did occasionally go into the left posterior thigh. He had occasional burning sensations in the left gluteal area. The sensations were more or less constant. They were aggravated by prolonged sitting. He stated that lifting, sitting, standing and twisting aggravated his sensation. He stated that he could sit and stand a maximum of one hour and was not sure how far he could walk.

("Miller Report II," Ex. 39 to Pennie Dep.)  The report continues, "If his current functional limitations are not sufficient to return to his old job then I would recommend a work hardening program as I believe he would significantly improve his capabilities." (Miller Report II at 3, Ex. 5 to Mergen Dep.)

On March 29, 2002 UPS sent a letter to Pennie, advising him that if he wanted a job-related accommodation for his permanent lifting restriction under the ADA, his physician would have to fill out the attached medical forms.  (Mergan Dep. at 48-49, 66-69; Pennie Dep. 195-96.)  Saindon also sent follow-up letters on April 24, 2002 and May 15, 2002.  (Def.'s Am. 56.1 ¶ 37.)  Pennie did not respond to either of these letters because, according to Pennie, he "did not believe he was disabled" and "expressed his belief that he was capable of returning to work to various doctors, whose reports were communicated to UPS."  (Pl.'s 56.1 Resp. ¶ 37.)

In a May 1, 2002 letter, Frank Sommario, an attorney who represented Pennie in his workers' compensation claim, advised Pennie to fill out the ADA forms if he was "amendable (*sic*)" to "outplacement" "with a possible job at another employer." (Ex. 24 to Pennie Dep., Ex. A to Pl.'s Mem.)  Pennie did not complete the forms because he believed to do so "would be implying that I had a disability."  (Pennie Dep. at 202-203.)  In a subsequent letter dated August 1, 2002, Sommario refers to previous letters dated July 1, 2002, July 2, 2002, advising Pennie that completing the questionnaire was the only way "we can move forward with your case." (Ex. 24 to Pennie Dep.)  The August 1, 2002 letter goes on to advise Pennie that he must fill out the forms "for UPS to make a determination as to whether they have a job that you can work given your

permanent restrictions." (Ex. 24 to Pennie Dep.) On August 23, 2002, Sommario wrote Pennie again, informing him that due to Pennie's refusal to fill out the ADA forms, UPS was unable to determine whether it could "accommodate your permanent restrictions." (Ex. 25 to Pennie Dep.) The letter continues, "Thus, you must seek employment elsewhere that would accommodate your permanent restrictions." (Ex. 25 to Pennie Dep.)

On May 3, 2002, Sommario sent a letter to Zhungo concerning the settlement of Pennie's worker's compensation claims. In the letter Sommario writes that Pennie "has been returned to work with major restrictions, which your client the employer does not wish to accommodate. This leaves you with an exposure for a wage differential in the future." (Ex. 28 to Pennie Dep.) He estimated potential damages against Liberty Mutual in the range of $214,375 to $239,474, based on a "weekly wage differential of $386.20" over a "25-years work life expectancy. " (*Id.*) Pennie himself did not receive a copy of this letter. (Pl.'s 56.1 ¶¶ 39.)

After receiving Sommario's letter, Liberty Mutual sent Pennie to Cascade Employment Rehabilitation Services on June 18, 2002, to determine his future employability. Cascade's report, which was sent to Liberty Mutual, described the results of a functional capacity evaluation and observed that Pennie was still experiencing lower back pain, which he sometimes alleviated with the prescription painkiller Vioxx, as well as difficulty standing or sitting for long periods of time. ("Cascade Initial Evaluation Report" (UPS 252-254), App. A to Pl.'s 56.1.) The report noted that "Pennie expressed interest in returning to work at United Parcel Services, stating he had returned in a temporary capacity completing light delivery since the time of his injury." (Pl.'s 56.1 ¶ 35.) A Cascade consultant met with Pennie a second time on June 27, 2002. ("Cascade Progress Report" (UPS 314-315), App. A to Pl.'s 56.1) The report of that meeting notes that Pennie "indicated he had an interest in staying with United Parcel Service" and expressed concern that UPS "would not take him back in a light duty position." (Pl.'s 56.1 ¶ 36.) On July 8, 2002, Cascade sent a copy of the report to Liberty Mutual. Throughout this period, from February 13, 2002 through May 15, 2003,

Pennie continued to receive temporary total disability ("TTD") benefits.

**The Settlement Agreement and Pennie's Attempt to Return to Work at UPS**

On May 15, 2003, Pennie and Liberty Mutual entered into an agreement to settle his four workers' compensation claims. (Ex. A to Pl.'s SJM Resp.) Under the terms of the Settlement Agreement, Pennie received total compensation of $112,314 to be paid out in an up-front lump sum payment of $85,000 and in installments of $3,300 per year for 10 years, beginning one year from the approval of the Agreement by the Illinois Industrial Commission. (Settlement Agreement, Ex. A to Pl.'s SJM Resp.) The terms of the Settlement Agreement also contained the following clause: "This settlement includes all claims for benefits past, present and future under Section 8(d)(1) of the Workers' Compensation Act of Illinois as a result of injuries arising out of an accident on or about 11/19/99, 07/28/00, 03/02/01, 8/23/01." (*Id.*) The Settlement Agreement is otherwise silent as to what the award was intended to compensate. Attached to the Settlement Agreement was a two-page addendum reciting the structure of the payments, Pennie's rights to the payments, the rights of Pennie's beneficiaries, Liberty Mutual's right to assign liability for the payments, and Pennie's right to purchase an annuity. Neither the Settlement Agreement itself nor the addendum mentions Pennie's separation or retirement from UPS as a condition of the agreement. Pennie and Sommario, his lawyer, signed the agreement, and Sommario asked the Illinois Industrial Commission to approve the settlement, which it did on May 15, the same day the Settlement Agreement was executed. (Def.'s Am. 56.1 ¶ 41.)

Pennie testified that he believed he remained an employee of UPS after executing the Settlement Agreement and that the $112,314 settlement was intended to compensate him for the difference between his $979.31 weekly wage and his $652.87 in TTD benefits for 89 weeks, a $3000 doctors' bill, and for non-permanent injuries that included his eye injury, hand injury, and back injury. (Def.'s Am. 56.1 ¶ 62.) Pennie admits that no examining doctor has determined that any of his injuries resulted in "permanent loss." (Pennie Dep. at 231.) Thus, under Pennie's

understanding of the Settlement Agreement, he received approximately $80,000 in compensation for a scratched cornea, eight stitches required for his cut hand, his back injuries and his related lost wages. (Def.'s Am. 56.1 ¶ 63.)

In discovery, UPS produced 31 workers' compensation settlement agreements involving claims by UPS employees under Section 8 of the Illinois Workers' Compensation Act. (Ex. F to Def.'s Mem.) Of these, 29 involved claims under Section 8(d)(1). Twenty-five of the agreements use the term "wage differential" when citing Section 8(d)(1). Those that do not use the words "wage differential" note that the compensated injury is "permanent" or based on "loss of man as a whole." At least one of the agreements includes an attached "Employee Separation Agreement." (Ex. B to Pl.'s Resp.) As UPS notes, none of the employees who entered into these agreements returned to work with UPS.

On May 16, 2003, one day after the Commission approved the Settlement Agreement, Pennie called Dr. Butler to ask for a release to return to work without any restrictions. Pennie testified in his deposition that Mike Colgan, a union representative, had advised Pennie to call Dr. Butler for a release if he wished to return to work. (Pl.s' 56.1 ¶ 40; Pl.'s 56.1 Resp. ¶ 47.) Pennie had not consulted Dr. Butler since February 2002. (Def.'s 56.1 ¶ 33.) When asked why he did not return to Dr. Butler earlier, Pennie testified that he believed Dr. Butler had discharged him because he was a surgeon and had concluded that Pennie's condition was inoperable. (Pennie Dep. 163-64.) Dr. Butler did not examine Pennie on May 16 because, according to Pennie, the earliest available appointment was in three weeks. (Pennie Dep at 246.) Instead, Dr. Butler gave Pennie a note dated May 21, 2003 which stated: "This is to verify that Mr. Pennie had his last office visit with us on February 13, 2002 and has been discharged from our care." (Def.'s Am. 56.1 ¶ 48.)

On May 23, 2003, Pennie received his first settlement check for $66,634.30 and his second check for $93. Pennie cashed both checks within a day or two of receiving them. (Def.'s Am. 56.1 ¶ 49.) Four days later, on May 27, 2003, Pennie returned to the UPS facility in Northbrook, Illinois,

and presented Dr. Butler's note to his center manager, Robert Baysinger. Pennie asked Baysinger to return him to his package car driver job. (Def.'s Am. 56.1 ¶ 50.) According to his deposition testimony, Baysinger refused because the note said nothing about Pennie's ability to return to work. (Pl.'s 56.1 ¶ 51.)

Immediately after Baysinger refused to reinstate him, Pennie consulted Dr. Kermit Murray, a physician at Concentra Medical Center. Dr. Murray examined Pennie, and Pennie told him that he felt no pain and believed he was able to return to work without any restrictions. Dr. Murray released Pennie to "full duty as of 5/27/2003." (Def.'s 56.1 Resp. ¶¶ 41-42.) In the meantime, Baysinger called Mergen about Pennie's attempt to return to work, and Mergen told Baysinger that Pennie could not return because he had entered into a settlement agreement based on his 25-pound permanent lifting restriction. (Def.'s 56.1 Resp. ¶¶ 43-45.) Mergen told him that as a result of the settlement, Pennie was no longer a UPS employee. (Def.'s Am. 56.1 ¶ 52.) Baysinger made a report of the conversation with Mergen, which reads in part:

> I then called Dennis Mergen and he explain [sic] to myself and Tom that a settlement was made over a week ago under the assumption that he had a permanent [sic] disability of a 25 pound restriction.

(Baysinger Dep. at 96, Baysinger Ex. 13). Baysinger could not recall if the term "permanent disability" was used by Mergen or supplied by Baysinger. (Baysinger Dep. at 96, 99). Baysinger further testified that "with a 25 pound restriction, you can't do our job." (Baysinger Dep. at 97, 98.)

Pennie returned to the facility later that day and presented Baysinger with Dr. Murray's release. Baysinger stated that he was "unclear" about the significance of Dr. Murray's note and again called Mergen, who spoke with both Baysinger and Pennie in a conference call. (Def.s' 56.1 Resp. ¶ 45-46.) According to Baysinger's notes of this phone call, Mergen told Pennie that "a settlement was made over a week ago under the assumption that [Pennie] had a permanent disability of a 25 pound restriction." (Ex. 13 to Baysiger Dep.) Mergen himself did not recall having a phone conversation with Pennie and Baysinger. (Mergen Dep. at 78.)

Liberty Mutual sent a letter to Sommario dated May 27, 2003 offering Pennie $200 as consideration to enter into an Employee Separation Agreement. (Separation Agreement Letter, Ex. G to Pl.'s Resp.) UPS claims that the Separation Agreement was intended to "memorialize" Pennie's separation and "effect[] a full release of any and all claims related to the separation of UPS employment" since the workers' compensation settlement "only released his workers' compensation claims." (Pl.'s 56.1 ¶ 51; Def.'s 56.1 Resp. ¶ 51.) The proposed Employee Separation Agreement itself states, "Employee is employed at the Company and is willing to voluntarily resign from said employment and waive all rights with respect to any matter connected with Employee's employment with the Company and separation of said employment." In a separate paragraph, the agreement identifies numerous statutory and common law claims that the signor agrees to waive, but does not refer to workers' compensation claims. The agreement states its effective date as May 27, 2003. ("Employee Separation Agreement," Ex. G to Pl.'s Resp.) Pennie refused to sign the agreement. (Pl.'s 56.1 ¶ 51.)

Teamsters Local 705 filed a grievance on Pennie's behalf on May 30, 2003. The grievance stated that "Pennie was not allow (*sic*) to return to work on this date [May 27, 2003] after returning from an injury." Gary Landem, a district labor relations manager at UPS, learned of Pennie's attempt to return to work "a couple weeks" after the grievance had been filed. (Pl.'s 56.1 ¶ 49.) Landem "handles contract negotiations and grievances on behalf of UPS," and defends UPS if a grievance reaches a joint grievance panel without settling. (*Id.*; Def's 56.1 Resp. ¶ 52.) In his deposition, Landem could not recall the specific facts of Pennie's grievance, conversations he had with the union business agent, or conversations with Pennie regarding his grievance. (*Id.*) According to Pennie's testimony, Landem spoke with Pennie at a grievance proceeding in June of 2003 and told him he did not believe Pennie was capable of doing his job, refused to authorize a second functional capacity evaluation, and told that Pennie he would never work for UPS again. (Pl.'s 56.1 ¶ 52.)

On July 2, 2003, a joint grievance panel of Local 705 and UPS officials "deadlocked" the grievance, meaning they failed to reach a resolution. (Def.'s Am. 56.1 ¶ 58; Grievance Form, Ex. 32 to Pennie Dep., Ex. A to Pl.'s Mem.) Local 705 decided not to take the next step—arbitrating the grievance—and on November 12, 2003, informed Pennie by letter that "the Union is unable to arbitrate your discharge." (Order and Stipulation of Fact, ¶ 1 and Ex. A.) The effect of this decision was to deny Pennie recourse under the collective bargaining agreement to seek to overturn his discharge. Pennie had the option of objecting to this decision within five days of receiving notice of the decision, and did so in a November 14, 2003 letter asking the union to change its decision and threatening legal action if it did not. (Def.'s Am. 56.1 ¶ 59; "Stipulation," Ex. J to Def.'s Mem. ¶ 1.) In addition, Pennie filed a charge of discrimination with the Illinois Department of Human Right on November 17, 2003. (Def.'s Am. 56.1 ¶ 61.) On January 8, 2004, Local 705 again told him that it would not arbitrate his grievance. (Def.'s Am. 56.1 ¶ 60.)

On January 19, 2004, a human resources entry clerk recorded Pennie's termination in UPS's "GEMS" online filing system. (Def.'s Am. 56.1 ¶ 67.) After Pennie's termination cleared on January 19, 2004, it was the responsibility of Hewitt & Associates, the administrator of UPS's health insurance benefits, to terminate Pennie's health benefits and send him a letter describing his COBRA benefits. (Def.'s Am. 56.1 ¶ 68.) Hewitt & Associates did not in fact send that letter for more than two years. In a letter dated March 9, 2006, Hewitt & Associates stated that Pennie's termination was effective as of January 18, 2004 and that his company health benefits would terminate on January 31, 2004, but Pennie could elect to remain covered under his current plan for up to 18 months. (Def.'s Am. 56.1 ¶ 69.) Upon receiving the March 9, 2006 letter containing the COBRA notice, Pennie filed a new grievance with Local 705 on March 23, 2006, claiming that his late COBRA notice was a "termination" and that UPS should return him to work. (Pennie Dep. at 302.) Local 705 declined to pursue the grievance, explaining in a May 5, 2006 letter that Pennie had been "separated from employment in 2003." (May 5, 2006 Letter, Ex. E to Order and

Stipulation of Fact ¶ 7.)

Pennie continued to receive medical, dental and vision benefits for himself and his entire family under the UPS group policy until March 2006. Because of this continued coverage, Pennie chose to decline benefits coverage at the full-time job he had started at Walgreens in January 2005. (Def.'s Am. 56.1 ¶ 70.) UPS contends that the continuation of coverage was a mistake that allowed Pennie to continue receiving benefits at no cost. (*Id.*) Pennie testified that he thought this extension of coverage was part of his "package" from UPS. (Pl.'s 56.1 Resp. ¶ 70.)

## **DISCUSSION**

Pennie alleges that UPS's decision to terminate his employment constitutes discrimination on the basis of his race, gender, and perceived disability and, further, was in retaliation for filing a discrimination claim. UPS advances two arguments in favor of summary judgment on all Pennie's claims. First, UPS contends that Pennie has failed to produce sufficient evidence to support any of his six claims, and notes that Pennie has not opposed UPS's motion except on Counts I and II, for which Pennie has filed a separate motion for summary judgment. Because its motion is unopposed as to Counts III through IV, UPS contends that it is entitled to summary judgment on these claims. With respect to the merits of Counts I and II, UPS argues that Pennie has not produced sufficient evidence in support of his ADA claims in Counts I and II that UPS regarded him as disabled, nor rebutted UPS's legitimate non-discriminatory reason for his separation. UPS urges that Pennie's failure to establish a genuine issue as to whether UPS regarded him as disabled entitles UPS to summary judgment.

Alternatively, UPS contends that Pennie should be judicially estopped from arguing that he is capable of performing his job as a package car driver because the Settlement Agreement was based on the opposite representation—namely, that Pennie was unable to perform his job due to a permanent lifting restriction. Because each of Pennie's claims requires proof that he was capable of performing his job, a determination that Pennie is estopped from making this argument or cannot

meet his burden of proof would entitle UPS to summary judgment on all counts in the complaint.

**Summary Judgment Standard**

A court will grant a motion for summary judgment when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). At this stage in the proceedings, the court does not weigh the evidence presented, but merely determines whether any genuine issues exist and require a trial. *See Winters v. Fru-Con Inc.*, 498 F.3d 734, 744 (7th Cir. 2007). The nonmoving party is entitled to all reasonable inferences that can be drawn from the record. *Freeland v. Enodis Corp.*, 540 F.3d 721, 737 (7th Cir. 2008). The nonmoving party must, however, also identify, "with reasonable particularity," the evidence on which it relies, and the court need not "scour the record" searching for a genuine issue for trial. *Winters*, 498 F.3d at 744.

**Counts III-VI, and VIII: Race and Gender Discrimination**

In his complaint, Pennie alleges that UPS discriminated against him by reinstating previously injured employees who had filed workers' compensation claims, but who were not, like Pennie, white males. Because Pennie has not offered direct or circumstantial evidence of discrimination, his claims necessarily proceed under the indirect, burden-shifting framework first announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and adopted in other contexts. To establish a prima facie case of disparate treatment based on gender or race under this framework, Pennie must show (1) he was a member of a protected class; (2) he was meeting his employer's legitimate performance expectations; (3) he suffered an adverse employment action; and (4) the employer treated similarly situated employees outside the class more favorably. *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 538 (7th Cir. 2007) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000).

As noted, Pennie has not presented any argument in support of his race or gender

discrimination claim. In his Local Rule 56.1 Statement of Facts in Support of his Motion for Summary Judgment, however, Pennie lists other UPS employees identified in his deposition testimony as being minorities and/or women similarly situated to Pennie who received preferential treatment. (Pl.'s 56.1 ¶ 54.) Specifically, Pennie identifies several drivers he claims had longer periods of TAW and were allowed to return to work after being injured. These individuals include three drivers Pennie identifies as Hispanic—Al Suarez, Jr., Enrique Garza, Francisco Garza—and two drivers Pennie identifies as black—Carey Jones and Harvey Mitchell. (*Id.*) Pennie also identifies Linda Kruppa, Cindy Miller, and Michelle Buck as women drivers who had been injured and were allowed to return to work. Pennie testified in his deposition that he believed Michelle Buck received "work hardening" for a back injury before returning her regular position. (Pennie Dep. at 367, Ex. A to Def.'s Mem.) Pennie admits in his response to UPS's 56.1 statement, however, that he does not know how much TAW any of these drivers received or whether any of them had restrictions when they returned to work after settling their claims. (Pl.'s 56.1 Resp. ¶¶ 76-77.)

Further, as Pennie also concedes, only three of these drivers—Michelle Buck, Linda Kruppa, and Alberto Suarez, Jr.—entered into workers' compensation settlements with UPS. (*Id.* ¶ 78.) None of these settlements involved a settlement under Section 8(d)(1) of the Workers Compensation Act. Pennie claims this fact is irrelevant; denies that his own settlement agreement involved a Section 8(d)(1) wage differential claim. (*Id.*) Pennie's Settlement Agreement did, however, cite Section 8(d)(1) in its terms, albeit without using the term "wage differential" (a reference to the difference between an employee's pre-injury and post-injury earnings).[2] Mergen

---

[2] Section 8(d)(1) is intended to compensate an employee who has incurred a disability during his employment that (1) prevents him from continuing in his current job and (2) decreases his future earning capacity. *See Casens Transp. Co. v. Indus. Comm'n*, 218 Ill.2d 519, 530-31, 844 N.E.2d 414, 422 ( 2006). The statute provides in relevant part:

> If, after the accidental injury has been sustained, the employee as a result thereof becomes partially incapacitated from pursuing his usual and customary line of
>
> (continued...)

testified that he was unaware of any UPS employee who had returned to work after entering into settlement agreement under Section 8(d)(1), and UPS notes that Pennie has failed to identify any who had done so.  (Def.'s 56.1 ¶ 79.)

For its part, UPS did produce 31 workers' compensation settlements for employees within its Metro Chicago district that did involve wage differential claims under Section 8(d)(1), and notes that none of the employees returned to work after settling their claims.  (Jaeger Aff., Ex. F. to Def.'s Mem.)  According to UPS, these settlements represent all such agreements under Section 8(d)(1) in the Chicago area since 2001.  (Id. ¶ 6.)  UPS identifies the races and sexes of the employees as nine African-Americans, four Hispanics, 18 Caucasians, 20 men and five women.  (Def.'s 56.1 ¶ 80.)  Pennie claims in his Response to UPS's Motion for Summary Judgment that only 20 of these agreements were tendered to him in discovery.   The rest were produced for the first time as attachments to the affidavit of UPS risk management supervisor, Jason Jaeger, Exhibit F to UPS's Memorandum in Support of Its Motion for Summary Judgment.  Further, one of the agreements involved settlements under Section 8(d)(2), which governs total disability, and another involved a settlement under Section 8(c), which governs "serious and permanent disfigurement."  820 ILCS 305/8.  (Settlement Agreements for Jaime Gutierrez and Jeffrey Merrick, Jaeger Aff., Ex. F to Def.'s Mem.)

The remaining 29 do involve the settlement of Section 8(d)(1) claims, however.  These workers' compensation settlement agreements and Pennie's deposition testimony are the only evidence of any UPS employees "similarly situated" to Pennie.  The Seventh Circuit defines

---

[2](...continued)
employment, he shall . . . receive compensation for the duration of his disability, subject to the limitations as to maximum amounts fixed in paragraph (b) of this Section, equal to 66-2/3 % of the difference between the average amount which he would be able to earn in the full performance of his duties in the occupation in which he was engaged at the time of the accident and the average amount which he is earning or is able to earn in some suitable employment or business after the accident.

820 ILCS 305/8(d)(1).

"similarly situated" as "similarly situated *in all respects.*" *Spath v. Hayes Wheels Int'l-Indiana, Inc.*, 211 F.3d 392, 397 (7th Cir. 2000) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (7th Cir. 1992) (emphasis in original)). "In determining whether two employees are similarly situated, . . . a court must look at all relevant factors, the number of which depends on the context of the case." *Radue v. Kimberly Clark*, 219 F.3d 612, 617 (7th Cir. 2000). In his Response to UPS's Motion for Summary Judgment, Pennie makes no argument that any other UPS employees were similarly situated in any respect. With respect to the three employees identified in Pennie's deposition who entered into workers' compensation settlement agreements with UPS and were allegedly allowed to return to work after being injured, Pennie has not produced any evidence, other than his own unsubstantiated testimony, that any of these individuals suffered similar injuries, engaged in similar conduct, worked under the same supervisors, or entered into similar settlement agreements with UPS. More importantly, none of those three agreements purported to involve a settlement under Section 8(d)(1), the only section of the Illinois Workers' Compensation Act identified in Pennie's Settlement Agreement. Because Pennie has failed to establish a prima facie case of disparate treatment based on race or gender, the court grants UPS's motion for summary judgment on Counts III, IV, V, VI and VIII.

### Counts VII and IX: Retaliatory Discharge for Filing a Discrimination Claim and Common Law Retaliatory Discharge

Pennie alleges that UPS fired Pennie via a March 9, 2006 letter on UPS letterhead titled "COBRA Enrollment Notice" notifying Pennie that he had been terminated effective "January 18, 2004" and had until "December 31, 2299"[3] to elect to obtain COBRA coverage. (Pl.'s Compl. ¶ 62; Pl.'s 56.1 ¶ 53; Ex. 35 to Pennie Dep., Ex. A to Def.'s Mem.) After receiving the letter, Pennie filed a grievance with the union for unjust termination. (Pl.'s 56.1 ¶ 51.) It was this letter that first effected his termination, Pennie insists. The Settlement Agreement did not effect a termination of

---

[3] The date is an obvious typographical error. UPS has not explained what the notice should have said.

his employment, he urges, noting that UPS itself sought his resignation in a May 27, 2003 letter to Pennie's attorney in which Liberty Mutual, acting as UPS's agent, offered Pennie $200 as consideration to enter into an Employee Separation Agreement. (Separation Agreement Letter, Ex. G to Pennie's SJM Resp.)

UPS admits that Hewitt & Associates, the third party company that administers UPS's health benefits, sent the COBRA notice letter to Pennie in March 2006, but UPS asserts that the COBRA letter was delayed as a result of clerical error. According to UPS, Hewitt and Associates typically terminates health benefits shortly after an employee's termination is entered into UPS's "GEMS" system. (Knox Decl., Ex. H to Def.'s Mem.) A human resources data entry clerk entered Pennie's termination into the GEMS system on January 19, 2004, shortly after the union determined it would not arbitrate Pennie's discharge. (Def.'s Am. 56.1 ¶ 67.) Derrick Knox, an employee services manager at UPS who is familiar with the GEMS system and with Hewitt & Associates' process for terminating a former employee's health benefits, stated that he could not determine why Hewitt and Associates did not send Pennie a COBRA notification letter until March 2006. (Knox Decl. ¶¶ 2-4, 8.) Regardless, UPS points out that the COBRA letter can hardly be interpreted as "retaliatory" given that there is no evidence anyone at Hewitt & Associates knew of Pennie's workers' compensation claims or of his discrimination claim lodged with the Illinois Industrial Commission. And the failure to terminate Pennie's benefits and send a COBRA notification letter earlier hardly disadvantaged Pennie: as a result of the delay, he continued receiving full paid health benefits for himself and his family for more than two years after his discharge was entered into the GEMS system, even after Pennie began a full-time position with Walgreens in January 2005. (Def.'s Mem. at 15.)

In addition, UPS observes that on November 12, 2003, the union notified Pennie in writing that it would not arbitrate Pennie's "discharge." (Def.'s Am. 56.1 ¶¶ 58-59.) The union also sent Pennie a letter in response to his 2006 grievance filing stating that it would not pursue the grievance

because Pennie had been "terminated in May 2003." ("Stipulation," Ex. J ¶ 7 to Def.'s Mem.)

As with his discrimination claims, Pennie has failed to respond to UPS's motion for summary judgment as to his claims for retaliatory discharge under the ADA and at common law. In his response, he does not address his retaliatory discharge claims or reference the above facts from the parties' Rule 56.1 Statements. *Weinstein v. Schwartz*, 422 F.3d at 477 n.1 (arguments not addressed in the briefs are deemed waived). To survive summary judgment on either claim, Pennie must show at a minimum that his discharge was causally related to his filing a claim the under the Illinois' Workers' Compensation Act, and he has failed to do so. *See Dotson v. BRP U.S.*, 520 F.3d 703, 707 (7th Cir. 2008). The court grants UPS's motion for summary judgment as to Counts VI and IX of the complaint.

## Counts I and II: Disability Discrimination

The parties have filed cross-motions for summary judgment on Pennie's ADA claims in Counts I and II of the complaint. Pennie alleges that UPS regarded him as "disabled" within the meaning of 42 U.S.C. § 12102(2)(c)—that is, UPS perceived him as having a "physical or mental impairment that substantially limit[ed] him in one or more major life activities." *Nese v. Julian Nordic Const. Co.*, 405 F.3d 638, 641 (7th Cir. 2005). As noted above, Pennie has not responded directly to UPS's motion for summary judgment on his ADA claims; he has, however, moved for summary judgment as to UPS's liability on that claim, effectively opposing UPS's motion. For the reasons discussed below, the court grants UPS's motion for summary judgment as to Counts I and II and denies Pennie's motion for summary judgment on those counts.

## The ADA Amendments Act of 2008

In Pennie's Reply to UPS's Response to his Motion for Summary Judgment, Pennie argues for the first time that the ADA Amendments Act of 2008, which took effect on January 1, 2009, should apply to the facts here. These amendments change the requirements for proving a "regarded as" disabled claim and explicitly overturn the Supreme Court's holdings in *Sutton v.*

*United Airlines, Inc.*, 527 U.S. 471 (1999) and *Toyota Motor Mfg. Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002). See ADA Amendments Act of 2008, Pub. L. 110-325, 122 Stat. 3553 (2008). The ADA Amendments Act of 2008 does not contain an express provision for retroactive application, and courts will not apply a statute to events preceding the effective date if doing so would cause a "retroactive effect." *See Landgraf v. USI Film Products*, 511 U.S. 244 (1994). Pennie nonetheless argues that the newly enacted amendment should apply because they "restored" Congress's "original intent" that "regarded as claims should be broadly construed." (Pl.'s ADA Reply at 3.) As UPS notes, however, the use of the word "restore" does not equate with the kind of clear expression of congressional intent contemplated by the Supreme Court in *Landgraf* or in *River v. Roadway Express, Inc.*, 511 U.S. 298 (1994), where the Court held that use of the word "restore" in a statute was insufficient to impute a congressional intent for retroactive application. Further, the Seventh Circuit, relying on *Landgraf*, has already held in at least one case that the amendment's effective date of January 1, 2009 controls and chose to "use the laws and interpretations that were in force when the complained-of acts occurred" rather than apply the new amendments. *Kiesewetter v. Caterpillar Inc.*, 295 Fed. Appx. 850, 851 (7th Cir. 2008) (applying pre-amendment definition of "disability" to ADA claim based on events that took placed in 2005). The court will therefore apply the law in force during the events of this case.

**Judicial Collateral Estoppel**

As a preliminary matter, UPS argues that it is entitled to summary judgment on Pennie's ADA claims based on the principle of judicial estoppel. Judicial estoppel is "an equitable concept providing that a party who prevails on one ground in a lawsuit may not . . . in another lawsuit repudiate that ground." *Johnson v. ExxonMobil Corp.*, 426 F.3d 887, 891 (7th Cir. 2005) (quoting *United States v. Hook*, 195 F.3d 299, 306 (7th Cir.1999). "In other words, judicial estoppel 'bars a litigant who has obtained a judgment on the basis of proving one set of facts from obtaining a judgment by turning around and proving that the facts were actually the opposite of what he had

proved in the prior case.'" *Devine v. Bd. of Comm'rs of Elkhard County*, 49 Fed. Appx. 57, 61 (7th Cir. 2002) (quoting *Reynolds v. City of Chicago*, 296 F.3d 524, 529 (7th Cir.2002)). UPS contends that Pennie's claim in this suit contradicts the position he took in settling his workers' compensation claims, where Pennie allegedly represented that he was unable to perform his job as a package car driver due to a "permanent 25-pound lifting restriction." According to UPS, the large amount of the settlement, $112,314, indicates that it was intended to compensate a wage differential claim under Section 8(d)(1) claim of the Illinois Workers' Compensation Act. (Def.'s 56.1 ¶ 40; Settlement Agreement, Ex. A to Pl.'s Resp. to Def.'s SJM.) Indeed, the Settlement Agreement refers specifically to Section 8(d)(1), which, as noted earlier, provides for compensation to an employee who has incurred a disability during his employment that (1) prevents him from continuing in his current job and (2) decreases his future earning capacity. *See Casens Transp. Co.*, 218 Ill.2d at 530-31, 844 N.E.2d at 422. Because a successful Section 8(d)(1) claim requires proof of the claimant's inability to return to work, UPS contends that Pennie is estopped from arguing that he is a qualified individual with a disability—a necessary component of his ADA claim. Pennie and his lawyer, Frank Sommario, both signed the Settlement Agreement and it was subsequently approved by the Illinois Industrial Commission. (Def. Am. 55.1 ¶¶ 40-41.) UPS avers that the Commission would not have approved the large settlement amount absent the clause regarding the settlement of all section 8(d)(1) claims. (Pl.'s Mem. at 5.**)**

UPS cites communications from Sommario as evidence that Pennie knew he had a permanent lifting restriction and that the Settlement Agreement was intended to compensate him in part for a lifelong disability. In several letters to Pennie between June and August 2002, Sommario refers to Pennie's "permanent restrictions" and the possibility that he will have to "seek employment elsewhere." In addition, UPS cites the settlement letter from Sommario to Liberty Mutual dated May 5, 2002, approximately a year prior to the Settlement Agreement. (Settlement

Letter, Ex. 28 to Pennie Dep.)[4]  In this letter, Sommario advised Liberty Mutual that it might be liable for a "wage differential" in the future due to Pennie's "major restrictions, which your client, the employer, does not wish to accommodate."  Sommario then proceeded to calculate a yearly wage differential of approximately $20,000 based the assumption that Pennie could find another job paying $10.00 per hour and would work for another 25 years.  (Def.'s Am. 56.1 ¶ 39; Ex. 28 to Pennie Dep.)  Pennie was not copied on the letter, but, UPS urges, statements made by Sommario on his behalf are binding on him.

Pennie contends that the Settlement Agreement did not include a wage differential claim for a permanent disability under Section 8(d)(1), but rather merely compensated him for his four injuries and for the difference between the wages he would have received as a package car driver and the TAW wages and the temporary total disability benefits he received between February 2002 and March 2003.  (Pl.'s 56.1 ¶ 39.)  He avers that the large settlement award was essentially a blunder on Liberty Mutual's part, inasmuch as they overestimated the time necessary for his eventual recovery and return to work.  Pennie notes that the language of his Settlement Agreement differs from those UPS produced as involving the settlement of "wage differential claims."  Among the 29 agreements involving section 8(d)(1) claims, all use the specific words "wage differential" or "permanent loss."[5]  At least one of the agreements included "a rider setting forth the petitioner's

---

[4]        Pennie argues that this letter is privileged and inadmissible under Rule 408 of the Federal Rules of Evidence, which governs the admissibility of settlement negotiations.  As UPS notes, however, the letter is not offered "to prove liability for or invalidity of the claim or its amount," but rather to show the parties' understanding of the Settlement Agreement.  *See Zurich Am. Ins. Co. v. Watts Indus., Inc.*, 417 F.3d 682, 689 (7th Cir. 2005) (courts have broad discretion to admit settlement communications for purposes other than to show liability or invalidity of claim, particularly where the claim in the communication is different from the one litigated).

[5]        As summarized in Pennie's Response to UPS's Motion for Summary Judgment:

The Agreement with Matthew Kissane states "Settlement is based on approximately 20% loss of use of man as a whole pursuant to section 8(d)(1)"; The Agreement of William Kroepil states "settlement represents a compromise of a wage differential

(continued...)

life expectancy, the amount of the wage differential and the period of the wage differential," and an attached "Employee Separation Agreement" signed by the employee. (Pl.'s Resp. at 6 and Ex. B.) Another notes that the employee's injury involved "permanent restrictions that prevent him from returning to work for the Respondent." (Pl.'s Resp. at 7 and Ex. D.) While Pennie's Settlement Agreement refers to Section 8(d)(1), it nowhere mentions a "wage differential claim" or "permanent disability," nor does the Settlement Agreement or the attached addendum mention anything about Pennie's termination or resignation from UPS.

Moreover, Pennie testified, at the time of the Settlement Agreement he did not believe that he was agreeing to separation from his employment at UPS, and he never represented to anyone at UPS or to any of his treating physicians that he believed himself disabled or incapable of performing his regular job. When Liberty Mutual sent him a letter asking for his resignation two weeks later, Pennie refused to sign the attached Separation Agreement. He also notes that he refused to fill out the ADA forms UPS sent him on two different occasions in the months leading up to the Settlement Agreement.

Pennie challenges UPS's interpretation of Section 8(d)(1) as requiring proof of permanent incapacitation; the statute's language specifically states that its terms apply only "for the duration of the disability." To prevail on a Section 8(d)(1) claim does not require, as UPS avers, proof of "permanent" incapacitation, just that the individual's injury prevented him from pursuing his usual employment and that he suffered some loss in earning capacity as a result. *See Cassens Transp.*

_____

[5](...continued)
and Man As a Whole claim" without statutory reference; The Agreement with Jeffrey Merrick states that it is "based on a wage differential pursuant to section 8(c)"; The Agreement with Sandra Manning states, "This settlement is based on a wage differential" but gives no statutory reference; The Agreement with Sharon Salvino states that it is "a compromise of a possible wage differential claim in full and final settlement of any and all claims under the Illinois Workers' Compensation Act for accidental injuries allegedly incurred," with no statutory reference; The Agreement with Maurice Walls states "Settlement is based on a permanent loss of earning capacity as set forth in section 8(d)(1)."

(Pl.'s SJM Resp. at 6.)

*Co. v. Indus. Comm'n*, 218 Ill.2d 519, 530-31, 844 N.E.2d 414, 422-23 (2006). ("To receive an award under section 8(d)(1), an injured worker must prove (1) that he or she is partially incapacitated from pursuing his or her usual and customary line of employment and (2) that he or she has suffered an impairment in the wages he or she earns or is able to earn.") The language of the statute indicates that compensation continues only "for the duration of his disability." 820 ILCS 305/8(d)(1). *See id.* at 529, 844 N.E.2d at 422 ("By its plain language, [section 8(d)(1)] allows arbitrators and the Commission the option of determining that a claimant's disability is likely to end, abate, or increase after a certain duration, and awarding compensation accordingly.") Nor does the fact that UPS's settlements with other employees under Section 8(d)(1) resulted in the termination of their employment supersede the plain meaning of the statute.

Pennie therefore did not necessarily adopt a contradictory position when he agreed to a settlement under Section 8(d)(1) for what he believed was a temporary reduction in earning capacity and then sought reinstatement after receiving a physician's opinion that he was no longer disabled. Under the terms of the Settlement Agreement, he merely represented that he was settling all claims under Section 8(d)(1) for "cut and 8 stitches to left hand; inflammation to left eye; pain in lower back." (Ex. A to Pl.'s Resp.) At no point did he personally represent to UPS or Liberty Mutual that his disability was permanent, nor is there any evidence that he agreed to resign or that UPS terminated his employment at this time. Sommario's May 3, 2002 letter to Liberty Mutual, discussing Liberty Mutual's wage differential exposure, is arguably attributable to Pennie, but it is unclear that Sommario had Pennie's authority to act as Pennie's agent in discussing settlement terms with Liberty Mutual. (Ex. 28 to Pennie Dep., Ex. A to Def.'s Mem.) Pennie was not copied on the letter and testified in his deposition that he had not discussed settlement authority with Sommario at this time. (Pennie Dep. at 208-210, Ex. A to Def.'s Mem.) Further, beyond the bare assertions in its briefs, UPS has failed to show that it or Liberty Mutual relied on the statements in Sommario's letter or made its terms a condition of the Settlement Agreement it later reached with

Pennie.

Given the absence from the Settlement Agreement of any language that Pennie's disability was permanent or evidence of any statement by Pennie himself to that effect, the court concludes that the doctrine of judicial estoppel does not bar Pennie's assertion that he was capable of performing his former job as a package car driver as of May 27, 2003.

**Pennie's ADA Claims**

Courts apply the *McDonnell-Douglas* burden-shifting framework to discrimination claims under the ADA. See *Germano v. International Profit Ass'n, Inc.*, 544 F.3d 798, 806 (7th Cir. 2008). To survive summary judgment, the plaintiff must show that "he was disabled within the meaning of the ADA, that he is qualified to perform the essential functions of the job, either with or without a reasonable accommodation, and that he suffered from an adverse employment action because of his disability." *Nese v. Julian Nordic Const. Co.*, 405 F.3d 638, 641 (7th Cir. 2005) (citing *Byrne v. Board of Educ., School of West Allis-West Milwaukee*, 979 F.2d 560 (7th Cir. 1992)) A plaintiff has met his burden on summary judgment if he produces "evidence supporting an 'inference' that discrimination was 'a determining factor'" in the employer's adverse employment action. *Germano*, 544 F.3d 806 (quoting *Trujillo v. PacifiCorp*, 524 F.3d 1149, 1154 (10th Cir. 2008)). The burden then shifts to the employer to offer a legitimate, nondiscriminatory reason for its adverse employment action. If the employer succeeds in meeting its burden, the plaintiff must show that there is a genuine issue of fact that the proffered reason is pretextual. *See id.* (citing *DeLuca v. Winer Indus., Inc.*, 53 F.3d 793, 797 (7th Cir.1995)).

To establish a prima facie claim that he was "regarded as" disabled under section 12102(2) of the ADA, Pennie must show either: "(1) the employer mistakenly believes the employee has a physical impairment that substantially limits a major life activity; or (2) the employer mistakenly believes that an actual, nonlimiting impairment substantially limits a major life activity." *Nese*, 405 F.3d at 641 (citing *Amadio v. Ford Motor Co.*, 238 F.3d 919, 925 (7th Cir. 2001)). Pennie relies on

the second approach, claiming that UPS terminated him and that its motive for doing so was Pennie's back injury, diagnosed by Dr. Miller as degenerative disc disease. It is not enough, however, that UPS knew of Pennie's recurrent back injuries or diagnosis of degenerative disc disease and subsequently fired him. Under the pre-amendment ADA, Pennie must show that UPS believed he had an impairment that substantially limited him in a major life activity. *Amadio*, 238 F.3d at 925. Pennie has the burden of identifying which major life activity the decision-maker regarded as substantially limited. *Amadio*, 238 F.3d at 925.

The ADA defines major life activities as including, but not limited to, "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Id.* (quoting *Sinkler v. Midwest Prop. Mgmt. Ltd. P'ship*, 209 F.3d 678, 683-84 (7th Cir. 2000) (citing 29 C.F.R. § 1630.2(l)). Pennie must demonstrate that UPS regarded him as "unable to perform the variety of tasks central to most people's daily lives." *Mack v. Great Dane Trailers*, 308 F.3d 776, 781 (7th Cir. 2002) (quoting *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 185 (2002), *superseded by statute*, ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553, *as recognized in Rohr's v. Salt River Project Agric. Improvement and Power Dist.*, 555 F.3d 850, 854 (9th Cir. 2009)). Thus, a belief that Pennie could not do his job as a package car driver is insufficient. *See Branham v. Snow*, 392 F.3d 896, 904 (7th Cir. 2004) ("Our cases make clear that 'an employer does not regard a person as disabled simply by finding that the person cannot perform a particular job.'" (quoting *Peters v. City of Mauston*, 311 F.3d 835, 843 (7th Cir. 2002)).

In his own motion for summary judgment, Pennie argues that UPS regarded him as substantially limited in the major life activity of "working." His response to UPS's motion elaborates, asserting that UPS perceived Pennie as "unable to perform the life activities of working a broad class of jobs that included lifting." (Pl.'s SJM Resp. at 2.) In support, Pennie has presented evidence of UPS's repeated requests that Pennie complete an ADA questionnaire to determine whether UPS could accommodate his "permanent restrictions." (Pl.'s ADA Reply at 10-12.) In

addition, Pennie cites UPS's marked copy of the Miller report as evidence that UPS perceived him as disabled. The underlined sections of the report focus on Pennie's diagnosis of degenerative disc disorder, the likelihood that he would be unable to return to work full time, and the probability of future degenerative episodes. (*See* Miller Report, App. C to Pl.'s 56.) Finally, Pennie cites Baysinger's comments about Pennie's frequent injuries and that he should consider another profession.

UPS argues that Pennie has presented evidence only of UPS's belief that Pennie had a permanent 25-pound lifting restriction that prevented him from performing his duties as a package car driver, and that such a belief does not demonstrate that UPS regarded him as unable to perform "an entire class of jobs or broad range of jobs," as required under the ADA. *See Squibb v. Memorial Med. Ctr.*, 497 F.3d 775, 782 (7th Cir. 2007) ("A demonstrated 'inability to perform a single, particular job' does not render an individual substantially limited in the major life activity of working." (quoting 29 C.F.R. § 1630.2(j)(3)(I)); *Peters v. City of Mauston*, 311 F.3d 835, 843 (7th Cir. 2002) ("[A]n employer does not regard a person as disabled simply by finding that the person cannot perform a particular job.") (citing *Byrne v. Bd. of Educ., Sch. of West Allis-West Milwaukee*, 979 F.2d 560, 567 (7th Cir.1992)). For example, the *Squibb* court held that a physician-imposed 25-pound lifting restriction that limited the plaintiff, a nurse, to "light-duty" work did not demonstrate that she was "significantly restricted in performing a broad range of jobs." *Id.* at 783. Similarly, in *Kupstas v. City of Greenwood*, 398 F.3d 609 (7th Cir. 2005), the plaintiff, a "truck driver/laborer," offered proof only of his employer's belief that, due to a physician-imposed lifting restriction, he could not perform the job's essential duties of his job, which included standing and walking for long periods and lifting objects weighing over 50 pounds. *Id.* at 610. The court held that this was insufficient to establish that the employer regarded him as disabled without some "evidence as to a class or range of jobs for which he otherwise was qualified, and from which [his employer] perceived him to be excluded." *Id.* at 614. In short, to support his "regarded-as" disabled claim,

Pennie must identify some class of jobs beyond merely package car driver that UPS considered him excluded from due to his perceived limitations.

With respect to the ADA questionnaires, the mere offer of accommodation by an employer is not conclusive evidence of a belief that the employee is disabled within the meaning of the ADA. *See Kupstas*, 398 F.3d at 614 (7th Cir. 2005) ("We do not assume that 'an employer offers accommodation only if it thinks that the employee suffers from a substantial limitation in a major life activity.'" (quoting *Cigan v. Chippewa Falls School Dist.*, 388 F.3d 331, 335 (7th Cir. 2004)). Mergen testified that UPS sends similar letters and forms to every employee who is unable to perform the essential functions of his or her job. (Def.'s 56.1 ¶ 36.) The two letters in the record were sent on March 29, 2002 and April 24, 2002 and, according to Mergen, were triggered by Liberty Mutual's report that Pennie had a lifting restriction. (*Id.*) The first letter in the record begins, "On March 29, 2002, we received notification that you requested a job-related accommodation because of a self-reported physical or mental condition." (Ex. 9 Mergen Dep., Ex. B to Def.'s Mem.) The second, sent by Saindon, also mentions Pennie's "recent request for a job-related accommodation." (Ex. 10 to Mergen Dep.) As stated in the letters, the forms were intended to assess whether Pennie required a job-related accommodation and, if so, whether such an accommodation was available. The March 29 letter also requested Pennie to notify UPS immediately "if our information is not correct, and you are not seeking a job related accommodation." Pennie chose not to respond to either inquiry because, he claims, he did not regard himself as disabled or requiring accommodation and feared that responding would result in his "outplacement" to another employer. In any event, neither the letters nor the forms, without more, support an inference that UPS believed Pennie was limited in an identifiable major life activity.

Next, Pennie attempts to argue that the underlined copy of Dr. Miller's report somehow demonstrates that UPS regarded him as disabled. Pennie contends that its emphasis on his

degenerative disc disease and future prognosis reflects a belief that Pennie was limited in a major life activity. While it is unclear who made the markings, Mergen did admit that his department would have received a copy and that Saindon, the occupational health supervisor who handled at least part of Pennie's claim, may have seen it. But even assuming arguendo that the markings were attributable to someone in Mergen's department, they do not support an inference that the writer thought Pennie incapable of someday returning to his job as a package car driver, let alone being disabled from "working" in general. (Pl.'s ADA Mem. at 6.) Mere knowledge of Pennie's "degenerative disc disease" and its accompanying symptoms will not impute to UPS a belief that Pennie could not perform a broad range of jobs or was otherwise limited in a major life activity.

The circumstances surrounding the Settlement Agreement present a more difficult question. Pennie argues that Baysinger made the decision to discharge Pennie and emphasizes Baysinger's repeated comments that Pennie was frequently injured and should consider another line of work as evidence of his perception that Pennie was disabled. As UPS notes, to succeed on his claim Pennie must show that someone with decision-making authority believed Pennie was disabled. *Merillat v. Metal Spinners, Inc.* 470 F.3d 685, 694 (7th Cir. 2006) ("[P]articular remarks [may] in fact support an inference that unlawful bias motivated the decision-maker, such as when those remarks are made by the decision-maker or one having input in a decision, and are made '(1) around the time of, and (2) in reference to, the adverse employment action complained of.'" (quoting *Hunt v. City of Markham*, 219 F.3d 649, 652-53 (7th Cir.2000))).

Identifying the relevant decision-maker in this case is complicated by the parties' disagreement over what event ended Pennie's employment with UPS. While it is clear that Pennie's employment did, in fact, end, UPS contends that the Settlement Agreement effected Pennie's "separation" on May 15, 2003 (despite the absence of any such terms in the Agreement itself) and that Mergen merely refused to reinstate Pennie based on his understanding of the effect of typical Settlement Agreement based on Section 8(d)(1). Pennie denies that he agreed to resign

as part of the Settlement Agreement and maintains that his actual date of termination could have been May 27, 2003, when Baysinger refused to allow him to return to work as a package car driver; January 18, 2004, the "retroactive" date of termination stated in the March 5, 2006 COBRA notice letter; or even the date of the COBRA notice itself. (Pl.'s ADA Mem. at 12.) Despite Pennie's argument that the date of his termination is unclear, he has not identified any event other than the May 15, 2003 Settlement Agreement or the May 27, 2003 refusal to reinstate him that could be construed as an "adverse employment decision" on the part of UPS. January 18, 2004 was merely the date a clerk recorded his termination in UPS's employment database and there is no evidence this person knew of Pennie's back injury. The COBRA notice was sent by a third party who had nothing to do with Pennie's employment at UPS. Further, Pennie concedes elsewhere that UPS regarded him as "separated" and his employment terminated when he voluntarily signed the Settlement Agreement.[6] Thus, in the absence of any other identifiable adverse employment decision on the part of UPS, the court turns to the events surrounding the Settlement Agreement and Pennie's return to work.

As discussed above, the parties hotly contest the significance of the Settlement Agreement. UPS avers that it was intended to compensate Pennie for the difference in wages he would suffer as the result of having to take a lower-paying job due to a permanent 25-pound lifting restriction and that Pennie's resignation was a condition of the settlement. Pennie counters that the lifting restriction was not permanent and that he believed the Settlement Agreement was intended to compensate him for four non-permanent injuries and for the difference in wages between his temporary total disability benefits and his regular wages. The Settlement Agreement itself states that it "includes all claims for benefits past, present and future under Section 8(d)(1) of the Workers' Compensation Act of Illinois," but does not mention compensation for a "wage differential" or any

---

[6] "UPS would seem to admit that it views the settlement agreement as a termination even though no resignation or termination agreement is contained in such Settlement Agreement." (Pl.'s Mem. at 13.)

"permanent" injury or restriction. UPS contends that all Section 8(d)(1) agreements are understood to include a "wage differential" settlement for "permanent" restrictions that have rendered the employee unable to do his or her job. As explained earlier, however, the language of Section 8(d)(1) does not contain any such requirements. UPS also contends that the large amount of the Settlement Agreement indicates an intention to compensate a lifetime loss of income owing to a permanent injury. UPS argues that Pennie held the same understanding, as evidenced by the Settlement Letter from his attorney to Liberty Mutual. That letter, however, predates the Settlement Agreement by over a year, and there is no evidence Pennie authorized it or received a copy. Further, UPS sent Pennie an "Employee Separation Agreement" approximately two weeks later offering Pennie $200 as consideration for his resignation. That agreement's terms identify the signor as a current employee who "is willing to voluntarily resign from said employment . . . ." (Ex. G to Pl.'s Resp.)

Regardless, however, of whether Pennie had legally resigned or been terminated by UPS as of May 27, 2003, he has not shown that either Baysinger or Mergen's refusal to let him work was based on a belief that they regarded him as disabled. Both Mergen and Baysinger did at different times refuse to allow Pennie to return to work on May 27, 2003, but both testified that their decisions were based on a belief that Pennie was no longer a UPS employee. According to Mergen's uncontroverted testimony, he believed that Pennie had been "separated" from UPS following the Settlement Agreement and that the Settlement Agreement included compensation for a "permanent 25-pound lifting restriction." Because such a restriction was incompatible with the essential job functions of a package car driver, Mergen refused to reinstate Pennie despite Dr. Murray's note releasing Pennie to "full duty." Mergen testified that he made the decision not to reinstate Pennie without consulting anyone else at UPS and that it was based on his belief that the Settlement Agreement represented Pennie's "separation" from UPS. (Def.'s 56.1 Resp. ¶ 48.)

In his deposition, Baysinger confirmed that he had neither the authority to terminate Pennie

nor "to give input into a decision about whether to terminate Pennie." (Def.'s 56.1 Resp. ¶ 43.) When Pennie attempted to return to work on May 27, 2003, Baysinger did initially refuse to reinstate him but, according to Baysinger, did so only because the "release" Pennie presented from Dr. Butler made no mention of being fit to return to work. In fact, the note merely stated that Pennie had been discharged from Dr. Butler's care over a year previously. Then, when Pennie left to obtain a release from a different doctor, Baysinger consulted Mergen by phone, who informed Baysinger that Pennie had been "separated" from UPS as the result of a settlement agreement based on Pennie's permanent 25-pound lifting restriction. Then, when Pennie returned with a medical release "to full duty," Baysinger and Pennie again called Mergen, who told Pennie he would not be reinstated because he had entered into a settlement agreement based on being unable to perform his package car driver job.

However bungled the communications may have been, nothing in the Settlement Agreement or in the actions of Baysinger and Mergen on May 27, 2003 demonstrates a belief on the part of anyone at UPS that Pennie was limited in a major life activity or unable to work in a broad class of jobs. At most, the Settlement Agreement and the request for Pennie's resignation show that UPS believed Pennie could not perform his job as a package car driver and that the Settlement Agreement was intended to compensate him for this limitation. That Pennie may in fact have been able to return to his regular job at the time of or shortly after the Settlement Agreement says nothing about UPS's perception of his abilities. As far as they knew from Pennie's medical reports (which Pennie himself never challenged in any communication with UPS) and from communication with his workers' compensation lawyer, Pennie had a 25-pound lifting restriction that prevented him from performing a job with a 70-pound lifting requirement. Similarly, Baysinger and Mergen's refusal to return Pennie to his former position reflected their belief that the Settlement Agreement severed Pennie's employment with UPS. Baysinger's previous comments about Pennie's frequent injuries do not support an inference that he believed Pennie was disabled when, at Mergen's direction, he

refused to reinstate Pennie. In short, Pennie has failed to adduce any evidence from which a jury could reasonably infer that UPS sought to end his employment because it perceived him as unable to perform a broad class of jobs. *See Delgado v. Certified Grocers Midwest, Inc.*, 282 Fed. Appx. 457, 462 (7th Cir. 2008) (Employer did not regard warehouse worker as disabled due to 50-pound lifting requirement where job required ability to lift 100 pounds and plaintiff presented no evidence that employer regarded him as unable to work in broad class of jobs). The court therefore grants UPS summary judgment as to Counts I and II of the complaint.

**UPS Counterclaim: Fraud**

On March 25, 2008, UPS filed a counterclaim against Pennie for fraud. UPS alleges that Pennie "told UPS he could not return to work without a 25-pound lifting restriction when he knew he could return to work without any restrictions." (Def.'s Counterclaim ¶ 31.) Pennie allegedly intended to deceive UPS and Liberty Mutual into paying him TTD benefits and to fabricate a wage differential in the hope of obtaining a large settlement. (Def.'s Counterclaim ¶ 32.) UPS seeks subrogation for payments to Liberty Mutual as reimbursement for Pennie's temporary total disability benefits and the lump sum and installment payments made pursuant to the Settlement Agreement. For the reasons discussed below, the court denies Pennie's Motion for Summary Judgment Against UPS's Counterclaim for Fraud.

**Statute of Limitations**

First, Pennie argues that UPS's fraud claim is barred by Illinois' five-year statute of limitations. *See* 735 ILCS 5/205; *Pearl v. Waibel*, 293 Ill. App. 3d 349, 355, 688 N.E.2d 336, 340 (4th Dist. 1997). Under Illinois law, where an injury is not readily discoverable due to, for example, the defendant's fraud, the statute of limitation begins to run when the victim either (1) actually discovers the wrongful injury or (2) has "sufficient information concerning [the] injury and its cause to put a reasonable person on inquiry to determine whether actionable conduct is involved." *Aebischer v. Stryker Corp.*, 535 F.3d 732, 733 (7th Cir. 2008) (citing *Daubach v. Honda Motor Co.*,

303 Ill. App. 3d 309, 314 707 N.E.2d 746, 750 (1999)); *see Barry Aviation v. Land O'Lakes Mun. Airport*, 377 F.3d 682, 688 (7th Cir. 2004) ("This rule is referred to as the discovery rule because the accrual date is not determined when the injury occurs but when it is discovered or should have been discovered."). Typically, the date on which a plaintiff receives inquiry notice is a question of fact for the jury. *Aebischer*, 535 F.3d at 734.

Pennie argues that UPS was on inquiry notice of what it now claims was fraudulent activity as early as August 2001. In support, Pennie points to UPS's suspicions regarding Pennie's claims of injury, specifically Bob Baysinger's memos to his employee file and Saindon's inquiries to Dr. Butler regarding seemingly fraudulent statements in Pennie's medical reports. (Pl.'s Counterclaim Resp. at 4-5.) Pennie also argues that UPS had "access to information that would lead a reasonable person to develop a good faith belief that Pennie held the requisite *scienter"* for fraud. This information is identified as "medical reports, rehabilitation documents, employee files, and communications between Pennie and Saindon." (*Id.* at 8.) Essentially, Pennie contends that UPS could have concluded that Pennie had the requisite fraudulent intent if it had studied statements in the medical reports that Pennie "really had no true pain" and "was capable of returning to work" and treated his repeated refusals to fill out the ADA forms as affirmative statements that he was not disabled. (*Id.* at 7-8.)

UPS insists that it could not have known of Pennie's alleged fraud before May 27, 2003, the day Pennie claimed he could return to work without any restrictions. Given the overwhelming evidence of Pennie's inability to perform his job before that date, the court is hard-pressed to disagree. In addition to Dr. Butler's diagnoses and prescribed lifting restrictions, Liberty Mutual ordered an independent functional capacity evaluation, a copy of which went to UPS, that confirmed Pennie's injury and imposed a 25-pound lifting restriction. Moreover, Saindon's "suspicions" regarding Pennie's back injury were duly dispelled by Dr. Butler. Finally, there is Somario's letter to Liberty Mutual regarding its possible "wage differential exposure" due to Pennie's "major

restrictions."  Whatever personal beliefs Pennie may have expressed to his physicians or his attorney regarding his physical condition, he did not communicate them to anyone at UPS until after he signed the Settlement Agreement.  Baysinger was in regular telephone contact with Pennie while he was on temporary total disability, and responded to Baysinger's inquiries about his ability return to work with comments such as, "You tell me.  It's your doctor."  Nor did Pennie apparently consult a doctor after February 2002 to have these supposedly unnecessary restrictions removed until after settling his workers' compensation claims.  UPS could hardly have been expected to probe Pennie's statements to his physicians or to intuit from his silence that he did not believe the lifting restrictions were necessary.  Indeed, the earliest UPS could have suspected Pennie had defrauded it of either the temporary total disability benefits or the settlement amount, which it contends was for a permanent lifting restriction, was the day Pennie entered the Northbrook Center and announced that he had been cleared for return to "full duty."  UPS's March 25, 2008 counterclaim is therefore timely.

**Fraud Claim**

Under Illinois law, a plaintiff claiming fraud must prove that the defendant made a false statement of material fact, that the defendant knew its statement was false and spoke with the intention of inducing the plaintiff to act, and that "the plaintiff acted in justifiable reliance upon the statement." *Indep. Trust Corp. v. Fid. Nat'l. Title Ins. Co. of New* York, 577 F. Supp. 2d 1023, 1037 (N.D. Ill. 2008) (quoting *Mitchell v. Norman James Constr. Co.*, 291 Ill. App. 3d 927, 940, 684 N.E.2d 872, 882 (1st Dist.1997)). To survive Pennie's motion for summary judgment, UPS "must identify sufficient evidence to sustain each element." *Id.*

UPS alleges that Pennie's unbroken silence from February 2002 through May 2003 regarding his ability to return to work constitutes an intentional misrepresentation that he had a permanent, 25-pound lifting restriction when he "knew" he could work without any restrictions. Silence or concealment of a material fact is actionable as fraud only where the silent party had both

an opportunity and a duty to speak and the ignorant victim would have acted differently had it been aware of the concealed fact. *Bors v. Duberstein*, No. 03 C 4636, 2004 WL 1588271, at *4 (N.D. Ill. July 15, 2004) (citing *Farm Credit Bank of St. Louis v. Isringhausen*, 210 Ill. App. 3d 724, 732, 569 N.E.2d 235, 240 (1991)).  Under Illinois law, a party has a duty to speak in two circumstances: (1) where he has a fiduciary relationship with the plaintiff, or (2) where his actions "contribute to the plaintiff's misapprehension of a material fact and [he] intentionally fails to correct [the] plaintiff's misapprehension." *Id.* (citing *Soranno v. New York Life Ins. Co.*, 96 C 7882, 2000 WL 748145, at *5 (N.D. Ill. May 31, 2000)).  UPS argues the second, identifying three occasions where Pennie remained silent in the face of UPS's belief that he had a 25-pound lifting restriction.

First, in February 2002, Pennie presented his supervisor, Steve Lopez, with a note from Dr. Butler imposing a 25-pound lifting restriction.  (Def.'s 56.1 ¶ 32; Ex. 15 to Pennie Dep.)  Dr. Butler's restriction was based on the results of the functional capacity evaluation, which Pennie asserts was tainted due to the initial 105-pound lifting test that limited his ability to successfully complete the exam.  (Def.'s 56.1 ¶ 29.; Pennie Dep. at 146-47.)  Pennie admits that he believed he was capable of returning to work in February 2002 when he presented the note to Lopez.  (Pl.'s 56.1 ¶ 30.)  He also testified, however, that he thought the functional capacity evaluation was "a measure of my ability at that moment in time" and believed it "was a precursor to further physical therapy."  (Pennie Dep. at 147.)  Pennie did not communicate any of these beliefs to Lopez when he presented him with Dr. Butler's note.  (Def.'s 56.1 ¶ 32.)  UPS contends that Pennie's presentation of the note, which he believed to be inaccurate, was an affirmative misrepresentation that Pennie intended UPS to rely on in order to collect disability benefits and planned eventually to parlay into a generous workers' compensation settlement.  (Def.'s Fraud Resp. at 4, 6.)

UPS next points to Pennie's failure to speak during the 15 months from February 2002 through May 2003 that he received disability benefits.  UPS contends that Pennie could have told UPS at any time that he was capable of returning to work, but never did so.  Baysinger contacted

40

Pennie regularly throughout his time on disability, and each time Pennie responded to his inquiries about returning to work by putting the onus on Baysinger, saying, "I don't know, you tell me, it's your doctor," or words to that effect. (Def.'s 56.1 ¶ 83.) UPS also notes that Pennie did not dispute the reasonableness of his 25-pound lifting restriction when he saw Dr. Miller in March 2002 for a follow-up exam. While Pennie expressed confusion to Dr. Miller as to why UPS had told him not to return to work in January, he did not contest the 25-pound lifting restriction. Dr. Miller's report states, "The examinee stated he had not worked since approximately January of 2002, because his employer had told him not to return to work. He was unsure why he had been pulled off the job." ("UPS 248," App. A to Pl.'s 56.1.) It was Dr. Miller's opinion based on his examination of Pennie that "his current functional limitations" would improve with "a good work hardening program." (*Id.*)[7]

Finally, UPS argues that Pennie's workers' compensation settlement "flowed directly from the false 25 pound lifting restriction submitted by Pennie and his silence regarding his true condition for the 15 months preceding the settlement." (Def.'s Fraud Resp. at 6.) UPS's primary support for this contention is the May 2002 settlement letter from Pennie's attorney to Liberty Mutual, in which he demanded compensation based on Pennie's need to work in a lower-paying job due to his "major restrictions." (Def.'s 56.1 ¶ 39; Ex. 28 to Pennie Dep.) The letter does not, as Pennie notes, explicitly state that the restriction are "permanent," but it does request a settlement based on a permanent reduction in wages over a 25-year period. Needless to say, Pennie's return to work two weeks after the settlement in full health is inconsistent with such a representation. In short, argues UPS, the lifting restriction imposed on February 13, 2002 is not and never has been necessary, and Pennie, fully aware of this, nonetheless maintained his silence, knowing UPS would trust the physician's reports and Sommario's representations. His conscious choice not to correct this misapprehension allowed him to swindle UPS out of 15 months of temporary total disability benefits

---

[7] As noted earlier, neither party has explained what is meant by "work hardening." Nor does the record provide information concerning the circumstances under which an employee (or the employer) can expect or request that a "work hardening" program begin.

and an approximately $112,000 settlement for a lifelong wage differential, all along planning to return to work immediately after the settlement was approved. (Def.'s Fraud Resp. at 7.)

Pennie has professed a belief that he could return to work in February 2002 without restrictions, a statement that directly contradicts his acceptance of disability benefits for 15 straight months. He could have told Baysinger during any one of their numerous phone conversations that he thought the restrictions were necessary or else taken the initiative to notified UPS himself. Further, there is a genuine issue of material fact as to whether the Settlement Agreement was intended to compensate Pennie for his four previous injuries or for a lifelong reduction in earning capacity. Pennie insists he believed the latter, but fails to explain why that would compel him to wait until the day after the Settlement Agreement's approval to consult a physician about his restriction or to notify UPS that his restriction had evidently been unnecessary all along. It is also unclear whether Pennie knew of his attorney's proposed settlement with Liberty Mutual, based on a loss in wages over a 25-year period. Finally, Pennie's sudden resolution to see a doctor about having his restriction removed and his subsequent return to work with a physician's note pronouncing him restored to "full duty" allows for the inference that Pennie intended to deceive UPS through his silence. *See Wash. Courte*, 643 N.E.2d at 216. There is some basis in the record, both in Pennie's comments to his treating physicians and in the physicians' reports themselves, to conclude that Pennie's lifting restrictions might be lifted through "work hardening" or other therapy, but that possibility does not eliminate disputes of fact concerning UPS's claim that Pennie omitted material fact with the intent to defraud.

**Reasonable Reliance and Damages**

Finally, the court turns to UPS's allegation of reliance and injury. In awarding Pennie temporary total disability benefits, Liberty Mutual, UPS's agent, relied on the functional capacity evaluation and two different physicians' conclusions that Pennie could not lift more than 25 pounds as of February 2002. Given Pennie's failure to object to these restrictions and his presentation of

the note from Dr. Butler to his supervisor, a jury could find this reliance was reasonable. Nor could UPS have been expected to interpret Pennie's failure to complete the ADA questionnaires as an objection to the restrictions, particularly in light of his continued acceptance of disability benefits up until the settlement of his workers' compensation claims.

As a direct result of its reliance on Pennie's medical records and his apparent willingness to remain on disability leave, Liberty Mutual paid Pennie $652.87 per week in benefits from February 13, 2002 through May 15, 2003. Had UPS and Liberty Mutual known that Pennie could return to his job without restrictions, UPS asserts it would have returned him to his job rather than continuing to pay these benefits. Similarly, neither Liberty Mutual nor UPS had reason to doubt that Sommario, who represented Pennie throughout the workers' compensation litigation, lacked the authority to propose a settlement based on a lifetime wage differential in May 2002. And the language of that Settlement Agreement invoked the statutory section UPS customarily used to settle wage differentials claims based on permanent disabilities. According to UPS, Liberty Mutual arrived at the figure of $112,314 after estimating Pennie's life expectancy and applying the 66-2/3 percent differential under Section 8(d)(1) to the anticipated $496.90 weekly difference in wages between his job at UPS and his future employment elsewhere due to a presumed permanent 25-pound lifting restriction. (Def.'s 56.1 ¶¶ 93-94.) UPS has therefore met its burden of showing reasonable reliance and damages resulting from Pennie's misrepresentations.

## CONCLUSION

For the foregoing reasons, the court GRANTS UPS's motion for summary judgment [60] on all counts in the complaint and DENIES Pennie's motions for summary judgment as to UPS's liability on Counts I and II of the complaint [64] and for summary judgment [67] on UPS's counterclaim for fraud.

ENTER:

*Rebecca R. Pallmeyer*

43

Dated: March 30, 2009

_____
REBECCA R. PALLMEYER
United States District Judge